# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
October 9, 2012 Session

## STATE OF TENNESSEE v. TIMOTHY W. SPARROW

**Direct Appeal from the Criminal Court for Williamson County**
**No. I-CR103731      Robbie Beal, Judge**

---

**No. M2012-00532-CCA-R3-CD - Filed March 14, 2013**

---

A Williamson County Criminal Court Jury convicted the appellant, Timothy W. Sparrow, of two counts of second degree murder, one count of attempted first degree murder, and one count of attempted aggravated robbery.  After merging the second degree murder convictions, the trial court imposed a total effective sentence of forty years in the Tennessee Department of Correction.  On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred by failing to suppress a suggestive pretrial identification of the appellant as the perpetrator; (2) whether the evidence was sufficient to sustain his convictions; (3) whether the trial court erred by not upholding the appellant's Batson challenge after the State peremptorily challenged a black juror; (4) whether the trial court erred by admitting a statement made by a State's witness; (5) whether the trial court erred by admitting a photograph of the murder victim that was taken while he was alive; (6) whether the trial court erred by admitting a black t-shirt that was alleged to belong to the appellant; (7) whether the trial court erred in its communications with jurors; (8) whether the trial court erred in sentencing; and (9) whether the principles of double jeopardy were violated.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph D. Baugh, Franklin, Tennessee, for the appellant, Timothy W. Sparrow.

Robert E. Cooper, Jr., Attorney General and Reporter, Rachel Harmon, Assistant Attorney General; Kim R. Helper, District Attorney General; and Terry E. Wood, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

A Williamson County Grand Jury indicted the appellant for the premeditated first degree murder of Jose Arias, the felony murder of Arias, the attempted first degree murder of Thomas Davenport, the attempted aggravated robbery of Davenport, and aggravated burglary. The charges stemmed from a shooting that occurred on August 18, 2008, at a residence on Arno Allisona Road. Prior to trial, the aggravated burglary charge was dismissed.

At trial, Kimberly Bennett testified that in August 2008, she and Davenport, her boyfriend, lived in a house at 6936 Arno Allisona Road that her friend, Marilyn Holt, had rented. Bennett stated that occasionally Arias spent the night at Holt's house and slept in the living room on the couch.

In the early morning hours of August 18, Arias was watching a movie in the living room, and Bennett and Davenport were asleep in their bedroom. Bennett explained that the bedroom window was beside the driveway and that the sound of a loud vehicle outside woke her. She thought the vehicle might be a truck. A few minutes later, Arias knocked on the bedroom door, and Bennett and Davenport allowed him to enter. Arias turned on the lights and said that his friend from Shelbyville was there to see Davenport. When Davenport asked to whom Arias was referring, Arias left, walked to the living room, and returned to the bedroom with the appellant. The appellant stood at the foot of the bed on the left, which was Davenport's side, and said that he had a gun he wanted to sell. Davenport said that he did not want to buy the gun. The appellant offered to sell Davenport a compact disk (CD) player. Davenport said that he did not have a car and had no need for a CD player. During the conversation, Arias asked the appellant if he had arrived alone. The appellant said yes. Arias turned to leave, and the appellant shot him with the gun he had tried to sell to Davenport. Bennett said the shot sounded like a firecracker. She turned toward the door and saw the appellant pointing the gun at Arias.

Bennett said that Arias walked down the hall, and the appellant followed, shooting at him multiple times. The appellant did not speak as he fired the gun. Bennett went to shut the bedroom door and discovered that the men were down the hall in the kitchen. Arias was facing the back door. The appellant stood over Arias and shot him in the face. Bennett shut the door, got back into bed, and covered her head. She heard the appellant running back to the bedroom. The appellant came in, went to Davenport's side of the bed and demanded, "[G]ive me everything you've got, Bubba[, which was Davenport's nickname]." Davenport responded that he did not have anything. Bennett then heard the gun click, and the appellant

ran out of the house. Bennett heard the loud vehicle leave.

After the appellant left, Bennett and Davenport walked toward the living room. As they went, they saw Holt standing in her bedroom doorway. Davenport proceeded to check on Arias while Bennett and Holt went into Holt's bedroom to call 911. Davenport brought Arias into the living room and put him in a chair. Approximately five minutes later, the police arrived. At the officers' request, Davenport, Bennett, and Holt stepped outside.

A couple of days later, Bennett went to the police station to see a photograph lineup. When she looked at the lineup, she was in a room with only Detectives Phillips and Benedict. She identified the appellant as the perpetrator from the lineup. Bennett noted that prior to the shooting, she had seen the appellant at Holt's house four or five times for approximately five minutes each time. The appellant usually came to the house with Charles Leverette, whose nickname was "Dump Truck," or with Leverette's mother. Bennett said that the appellant and Leverette came to the house to buy drugs. Bennett said that she did not sell drugs but that Holt and Davenport did. Bennett acknowledged that around the time of the shooting, she had used cocaine daily. Around 6:00 or 7:00 p.m. prior to the shooting, Bennett used approximately $30 worth of crack cocaine, which was about "the size of a peanut." She said the high lasted about an hour. Bennett acknowledged that she had several prior misdemeanor convictions for passing worthless checks.

On cross-examination, Bennett stated that Leverette was from Shelbyville and that he was friends with all of the residents of Holt's house. She stated that Leverette visited the house two or three times a week. Bennett said that when the appellant arrived that night, she and Davenport were asleep, the lights were off in the bedroom, and the bedroom door was shut. Bennett said that the appellant wanted to sell or trade Davenport a gun or CD player for money or drugs. Bennett stated that the gun was small and shiny but that she did not know if it was a revolver or a semiautomatic. Bennett said that approximately thirty or forty minutes after the shooting, Davenport spoke with Leverette on the telephone. Bennett said that after the appellant shot Arias point-blank in the face, blood went all over the kitchen. She stated that after the shooting, she found a shell casing on the floor of her bedroom near the television in the corner of the bedroom where the appellant had been standing. She put the shell casing on her chest of drawers and later gave the shell casing to Detective Benedict.

Bennett acknowledged that she used to be addicted to cocaine and that she had smoked $30 worth of crack cocaine the night before the shooting. However, she stated that the drugs had worn off by the time of the shooting and did not affect her memory, her hearing, or her sight. Bennett said that Detective Benedict did not have her listen to a car to try to identify the vehicle that came to Holt's house. Detective Benedict did show her a photograph lineup from which she identified the appellant. Bennett said that she saw

television news coverage showing Holt's house but that she never saw the appellant on television. When Bennett was shown a photograph of the appellant that was attached to a press release issued by Detective Benedict, she stated that she had never seen the photograph before.

Bennett stated that she knew the appellant as Larry. After the shooting, Leverette told her that Larry was the appellant's alias. She stated that when she went to view the lineup, she rode in the same car with Holt and Davenport. She did not recall what they discussed on the way to the police station. Bennett said that Holt did not see the appellant that night but that Bennett later told her the assailant was Larry. Bennett said that she saw the appellant for approximately three to four minutes in her bedroom prior to the shooting, but she conceded that it could have been a shorter amount of time.

On redirect examination, Bennett stated that she had not used cocaine since the shooting. She recalled that the appellant was wearing a plain navy blue or black t-shirt and long blue jean shorts.

Thomas Eugene Davenport testified that on August 18, 2008, he was living at 6939 Arno Allisona Road with Bennett and Holt and that Arias was spending the night at Holt's house. Around 2:30 a.m., Davenport and Bennett were in the bedroom watching television and getting ready to go to sleep. Davenport heard a loud car pull up outside. Someone knocked on the door, and Arias admitted the person. Davenport shouted to ask Arias who had arrived. Arias responded that it was his friend Larry from Shelbyville. Thereafter, Arias knocked on the door of Davenport's bedroom and said that Larry wanted to know if Davenport wanted to buy a gun. Davenport said that the room was lit by a bedside lamp. Arias and the appellant came into the bedroom and stood at the foot of the bed; the appellant was closer to Davenport than Arias was. Davenport stated that he had previously seen the appellant at Holt's house two or three times, usually with Leverette or Leverette's cousin or mother, and that he knew the appellant as Larry.

The appellant pulled out the gun and held it in his open palm. Davenport said that it was a small, shiny, silver .25 caliber gun. Davenport told the appellant that he did not have any money and could not buy it. Davenport mentioned that he knew someone who might be interested in buying it but that it was too late to make contact. The appellant then asked if Davenport wanted to buy a CD player. Davenport said that he did not because he did not have a car. The appellant suggested that Davenport put the CD player into Holt's car. As Arias started to leave the room, the appellant said, "[D]amn you, Jose," and ran behind Arias. Davenport saw a flash at the doorway and asked what the appellant was doing. Bennett told him that the appellant was shooting Arias in the back.

-4-

Arias ran down the hall into the kitchen, and the appellant followed him. Davenport heard three or four gunshots. Bennett jumped out of bed, slammed the bedroom door closed, and said, "[H]e's going to kill us." Davenport told her to lie down and put a pillow over her head, and she complied. The appellant kicked the bedroom door open, ran to Davenport, and demanded, "[G]ive me everything you've got." Davenport said the appellant "click[ed]" the gun in his face. Davenport told the appellant he did not have anything and held his hands in front of his face. Davenport thought the appellant was going to kill everyone in the house. Davenport then saw that a shell casing was sticking up from the gun, jamming it. When the appellant was unsuccessful at shooting Davenport, he turned and ran toward the door. Holt came out of her bedroom, and, as he ran, the appellant slammed her against the wall. The appellant ran out the door, and Davenport followed. From the door, Davenport saw that the appellant's car was white and had a "custom grill" and dark-tinted windows. Davenport shut and locked the front door, told the women to call 911, and went to check on Arias.

Davenport helped Arias walk from the kitchen to the living room, and Arias sat on the couch. One of the women handed Davenport the telephone, and he spoke with the 911 operator. The operator instructed Davenport to make Arias lean his head back. As he was doing so, Davenport noticed that Arias had been shot in the face. Davenport said Arias was holding a pair of pants against his wound but that he was still bleeding.

The police and an ambulance arrived in approximately ten to fifteen minutes. Emergency medical service workers (EMS) put Arias in the ambulance. Davenport said that approximately thirty to sixty minutes after the shooting, he received a call from Leverette. Leverette asked what was going on, and Davenport told him about the shooting. Leverette said that the appellant's name was not Larry, it was Timmy. Davenport then passed the telephone to an officer so he could speak with Leverette.

Davenport said that he later went to the police station with Holt and Bennett to view a photograph lineup. He said that during the drive, they discussed that the appellant's photograph would probably be in the lineup. Davenport positively identified the appellant as the perpetrator from the lineup. He recalled that the appellant was wearing a dark shirt on the night of the shooting.

Davenport identified a photograph of a white Ford Crown Victoria that looked like the car the appellant was driving. After the shooting, Davenport went to the police station to listen to the Crown Victoria as it was running. He said it had the same distinctive, loud sound as the car the appellant was driving.

Davenport said that Leverette came by Holt's house once every one or two weeks prior to the shooting to buy drugs. Davenport acknowledged that he and Holt sold drugs

from the house, that he had previously been convicted of selling drugs, and that he was incarcerated for selling drugs at the time of trial. He said that around 6:00 p.m. prior to the shooting, he, Bennett, and Arias had smoked crack cocaine. He said he was high for approximately twenty minutes and was no longer feeling the effects of the drug at the time of the shooting.

On cross-examination, Davenport stated that Arias never said anything after he was shot and that he lost a lot of blood. He recalled that Holt was asleep in her bedroom at the time of the shooting. She came to her door when the appellant was headed out of the house. As he left, the appellant hit Holt in the neck and slammed her against the wall. Davenport said that Bennett was sitting on her side of the bed and saw the appellant standing in front of her at the foot of their bed prior to the shooting.

Davenport said that he had known Leverette for approximately five or six years and that they had met while working at a factory where batteries were made. Davenport said that Leverette lived in Shelbyville and that he was not at Holt's house on the night of the shooting. When he called, Leverette told Davenport that "[h]e had called somebody just to be calling them up for something" and that person told Leverette that something had happened at Davenport's house. Leverette asked Davenport what was happening. At first, Davenport thought Leverette said that Larry's real name was Kenny, but he later realized Leverette said Timmy. Davenport said that by the time Leverette called, Arias was already dead. Davenport said that the timing of the call was not unusual because Leverette called anytime.

Davenport said that he did not see any local news coverage about the case and did not see a photograph of the appellant prior to the lineup. When Davenport, Holt, and Bennett went to the police department two days after the shooting to view the photograph lineup, Bennett said that she did not want to have to look at the appellant's face again. Davenport could not remember if they conversed further about the identity of the perpetrator.

Davenport acknowledged that he smoked crack cocaine hours before the shooting. However, he stated that he had not sold or used drugs since the shooting and that the conviction for selling drugs for which he was incarcerated was based upon his conduct some time before the shooting. Davenport denied that smoking crack cocaine that night affected his memory. Davenport conceded that at a prior proceeding, he testified that the last time he used cocaine was approximately one week after the shooting.

Marilyn Holt testified that she went to bed around 9:00 or 10:00 p.m. on August 17. She was later awakened by the sound of what she at first thought were firecrackers. When she opened her bedroom door, she saw a man running through the living room. As he passed

her, the man pushed her back into her bedroom. Holt said that she did not recognize the man but that he looked "quite large" and that she did not think the man was white. When the man left, Davenport approached her and told her to call 911 because Arias had been shot. As Holt called 911, she heard a vehicle start outside. She said the car had a distinct, loud sound. Holt asked who it was, and Bennett told her that it was Larry. Holt said that the only Larry she knew was from Shelbyville. Before that night, she had seen Larry at her house about four or five times. Each visit lasted ten to twenty minutes. She said that Larry usually arrived with other people, mostly Leverette or Leverette's mom or girlfriend.

Holt said that she later went to the police station and identified a white Crown Victoria that sounded like the one she heard that night.

Holt said that she never saw a gun that night. However, she said that she felt something hard in the perpetrator's hand when he pushed her back into her bedroom. She also said that she later had a bruise on her jaw.

Holt said that on the morning of the shooting, she gave a written statement to police. After viewing the statement during her trial testimony, Holt recalled that the perpetrator was black, but she could not recall seeing a gun.

Holt acknowledged that around the time of the shooting, people were using and selling crack cocaine at her house. She stated that she occasionally used crack cocaine and that she and Davenport sold cocaine. She acknowledged that she had been previously convicted of selling cocaine.

On cross-examination, Holt said that she had worked as a caregiver for the elderly for approximately thirteen years. She said that she moved into the house on Arno Allisona Road in November 2004 and that she rented the house from Evelyn Pitt, who lived two doors down on the same road.

Holt said that when the perpetrator ran past her, he pushed her into the frame of her bedroom door and that afterward she went into the bedroom. Bennett came into Holt's bedroom, jumped on her bed, and started screaming. Bennett told her that Arias had been shot by Larry. She stated that she stayed with Arias and tried to comfort him while they awaited an ambulance. She said that Davenport tried to stop Arias's bleeding. Holt said that there was blood in the kitchen after the shooting and that it was "a mess." She did not recall seeing any bloody footprints in the kitchen.

Holt acknowledged that she never saw the perpetrator but that she identified the appellant from the photograph lineup as a person she knew. She said that Bennett had told

her that the appellant was the perpetrator and that Holt then identified the appellant from the lineup.

Holt said that while she was at work, she saw the appellant's photograph on a television news report about the shooting; therefore, Holt knew the appellant was the suspect. She said that she did not recall talking with Bennett or Davenport about seeing the appellant's photograph on a news report but that she might have. However, she maintained that she, Bennett, and Davenport already knew the appellant was the perpetrator before any news was televised.

Holt said that she never saw the car the appellant was driving. She said that the car sounded like it had "a special kind of muffler or something, like *vroom*."

Holt said that Leverette was a friend of Davenport's, that he lived in Shelbyville, and that he frequently visited Holt's house. She said that Leverette bought cocaine at the house. Holt stated that arguments often occurred at her house when people owed money for drugs. She noted that Leverette "owes everybody" and was sometimes part of the arguments.

Holt said that she did not use cocaine daily, just on weekends. She did not smoke crack cocaine the night before the shooting.

Clifford Charles Leverette testified that he lived in Shelbyville and had known Davenport for six to eight years. Leverette said that he also knew Bennett, Holt, and Arias. Leverette stated that he and Arias had been to Holt's house together many times to buy and use drugs. He said that they bought drugs from Holt or Davenport. Leverette stated that he had known the appellant for one or two years and had been to Holt's house with him at least a dozen times. Each time, Leverette would call the appellant Larry because the appellant did not want anyone to know his name.

Leverette said that early in the morning of August 18, 2008, he called Davenport. He denied knowing about the shooting incident before the call, explaining that he had called to ask about acquiring drugs. During the call, Davenport told Leverette that Larry had shot Arias. Leverette said that detectives then joined the conversation and asked if Leverette knew Larry. Leverette revealed that Larry was a name used by the appellant, Timothy Sparrow.

Leverette acknowledged that he had a history of misdemeanor convictions, such as passing worthless checks.

On cross-examination, Leverette acknowledged that he had a previous conviction of

-8-

criminal impersonation and multiple convictions for misdemeanor thefts. Leverette stated that he had been to Holt's house on a near daily basis for drugs. He acknowledged that approximately thirty to sixty days before the shooting, he was involved in an altercation at Holt's house with some black men about money Leverette owed for drugs.

Leverette said that he had called Davenport around 3:00 or 4:00 a.m. He said he had called that early several times before. He stated that he was drunk and high when he made the call. He had been drinking all that day and was at home in bed, watching television and wanting drugs when he called Davenport.

Leverette stated that he did not know of any reason anyone would have ill will toward Arias, noting that Arias was "a real good friendly fellow."

Brandy Dion Ray testified that she lived in Tullahoma and that she knew the appellant. Around 5:00 a.m. on August 18, 2008, the appellant called her and asked for a ride, explaining that he wanted to spend the night at Ray's house because he had argued with his girlfriend. Ray agreed and picked up the appellant near a BP gas station in Shelbyville. The appellant was wearing tennis shoes, shorts, and a "wife beater" tank top undershirt. After they arrived at Ray's house, Ray gave the appellant a yellow shirt to wear. Then, the appellant slept on the couch, and Ray slept in her bedroom for an hour or hour and a half before leaving for work.

Ray said that while she was at work, her sister called and asked if Ray knew someone named Timmy Sparrow. Ray said that she did, and her sister told her that he was wanted for questioning about a murder. Ray called and told the police that the appellant was at her house.

Williamson County Sheriff's Deputy Michael Joseph Terns testified that at approximately 2:51 a.m. on August 18, 2008, he was dispatched to Arno Allisona Road because of a shooting. He arrived at the scene at 3:01 a.m. and ordered Davenport, Bennett, and Holt out of the house. Deputy Terns went into the house and saw Arias covered in blood and sitting in a recliner in the living room. Arias had a lot of blood on his face and inside his mouth, and his breathing sounded like "gurgling." He was unable to speak. Deputy Terns checked and found that Arias had a pulse. While EMS and other officers were en route, Deputy Terns confirmed that the house was empty. When Deputy Terns returned to the living room, Arias had no pulse, was not breathing, and was unresponsive. EMS arrived and put Arias in an ambulance. The medical examiner later said that Arias had died at the scene.

Deputy Terns said that later that morning, he questioned Davenport about the incident. Davenport said that Larry shot Arias and that he knew someone who knew Larry better.

During the conversation, Davenport called Leverette or Leverette called Davenport, and Deputy Terns asked Leverette questions about Larry. Leverette said that Larry was the appellant, Timothy Sparrow. Leverette told Deputy Terns that the appellant lived on Anthony Lane in Davis Estates in Shelbyville.

Dr. Amy R. McMaster, an expert in forensic pathology, performed the autopsy on Arias's body. During her examination, she detected four gunshot wounds. She said that a bullet entered the left cheek, traveled from left to right, toward the back of the body, and downward. The bullet was recovered from the right side of the neck. Dr. McMaster found stippling on the left cheek, indicating that the gun was fired between a couple of inches to a couple of feet from the cheek. She stated that the cheek wound was potentially fatal.

The next wound she detected was from a bullet that entered the right ear, exited the top of the ear, and entered the skull behind the ear. The wound was also potentially fatal.

Dr. McMaster also discovered that a bullet had entered the right side of Arias's back and was recovered from the left side of the chest. The wound was potentially fatal. Finally, another bullet had entered the right side of the back and was recovered from the right side of the chest. However, because the bullet did not injure an internal organ, the wound was not necessarily fatal. Dr. McMaster stated that the cause of death was multiple gunshot wounds.

Dr. McMaster said that Arias's blood tested positive for cocaine.

Shelbyville Police Officer Darrell Wayne Birdsong testified that in the early morning hours of August 18, 2008, he was on patrol and received a "BOLO" for a white sedan that was involved in a murder in Williamson County. Officer Wayne Boyd informed Officer Birdsong that he saw the vehicle at Davis Estates and that the subject ran away from the vehicle. After Officer Birdsong went to Davis Estates and saw the vehicle, he met with Williamson County Deputy Brad Fann to escort him to the scene. When they arrived, Deputy Fann used his police dog to search for the suspect. Officer Birdsong followed Deputy Fann and the dog to Depot Street. As they were walking, Officer Birdsong found a black t-shirt on the ground by the fence line. Officer Birdsong said that the fence was around an empty lot with tall grass that was wet from morning dew. He stated that no one discharged a weapon during the search.

On cross-examination, Officer Birdsong stated that he did not pick up the t-shirt but that Officer Boyd did.

Deputy Bradley Fann testified that he was a K9 handler and that his police dog, a

German Shepherd named Cash, was certified by the United States Police K9 Association in tracking humans. At approximately 5:00 a.m. on Monday, August 18, 2008, Deputy Fann and Cash were called to Bedford County, and Officer Birdsong escorted them to the parking lot of an apartment complex near Highway 46, Depot Street, and Anthony Street. Officer Birdsong directed Deputy Fann to a vehicle in the parking lot. Deputy Fann noticed that the vehicle was not in a parking space and that it appeared that someone had just stopped and gotten out of the vehicle. Officer Birdsong showed Deputy Fann the footprints of the suspect. Deputy Fann had Cash begin tracking the suspect. Cash led the officers down an incline and along a chain link fence behind Beech's Wrecker Service.

Around the fence line, in a grassy area that was damp with dew, Cash lay down in front of a black t-shirt. Deputy Fann explained that Cash's action indicated that the shirt was associated with the suspect they were tracking. Deputy Fann did not touch the shirt, but he noticed that it did not appear to have been in the weather for an extended period of time. Deputy Fann signaled to Deputy Rogers that the shirt was possibly evidence, and Deputy Fann and Cash continued tracking the suspect.

Deputy Fann said that after finding the shirt, Cash led the officers through a culvert. The ground was "mushy," and Deputy Fann could see footprints in the ground. As they headed on East Depot Street, Cash lost the scent.

Williamson County Sheriff's Lieutenant Tony Ray Phillips testified that on August 18, 2008, he and Captain Bennett went to Shelbyville because officers had spotted a white Ford car similar to the suspect's in the parking lot of the Davis Estates apartment complex. After Cash alerted on the t-shirt, Deputy Boyd collected the shirt and gave it to Lieutenant Phillips who put it in a brown paper bag. Lieutenant Phillips later handed the shirt to Detective Benedict.

While at the apartments, Lieutenant Phillips and Detective Benedict spoke with the appellant's family, who indicated that they had not heard from the appellant for a day or two.

Lieutenant Phillips said that the officers started the white car and noticed that it was very loud. The car seemed to have a muffler that made it louder.

The next day, Lieutenant Phillips received a call from Ray, who revealed that the appellant was at her house in Tullahoma. Detective Benedict and Lieutenant Phillips went to Ray's house and apprehended the appellant. At the time of his arrest, the appellant was wearing a yellow shirt. While at the house, Lieutenant Phillips collected the appellant's tennis shoes and gave them to Detective Benedict. The following day, Ray gave Lieutenant Phillips a cellular telephone as evidence.

On cross-examination, Lieutenant Phillips stated that immediately after he put the t-shirt in a paper bag, he stored the bag in an evidence box located in the back of Captain Bennett's truck. Lieutenant Phillips acknowledged that he did not know if Captain Bennett had any guns or ammunition in the box at the time. When they returned to the Williamson County Sheriff's Office, Lieutenant Phillips turned over the bag to Detective Benedict.

On redirect examination, Lieutenant Phillips said that he did not fire his gun on the day he collected the t-shirt.

Williamson County Sheriff's Detective Grant Benedict testified that he arrived at Holt's house at approximately 3:40 a.m. on August 18, 2008. Other officers and an ambulance were already on the scene.

Detective Benedict stated that in the kitchen, he found two spent shell casings and a piece of Arias's dentures. He found another spent shell casing in the hallway outside a bedroom door. He stated that there was also blood spatter in the floor. However, Detective Benedict was unable to find any shoe prints in the blood. Detective Benedict said that later that day, Davenport called to say he had found another shell casing in his bedroom. Detective Benedict went the house to retrieve the shell casing. Thereafter, Detective Benedict submitted the items to the Tennessee Bureau of Investigation (TBI) for testing.

Detective Benedict said that police later received a call informing them that the appellant was in Tullahoma. Lieutenant Phillips and Captain Bennett arrested the appellant. During the arrest, they collected the appellant's shoes, which Detective Benedict sent to the TBI for testing. Detective Benedict said that he also collected a black t-shirt from Lieutenant Phillips and sent it to the TBI for testing.

Detective Benedict said that when he saw the appellant following his arrest, the appellant was wearing a yellow golf shirt and shorts. Detective Benedict interviewed the appellant, who denied any knowledge of the victim or the murder. The appellant also stated that he had never been to Holt's house. The appellant said that he had been at Ray's house in Tullahoma since 5:00 p.m. on August 17, 2008.

Detective Benedict stated that on August 20, Davenport, Bennett, and Holt came to the station to view a photograph lineup. The witnesses arrived together, but Detective Benedict interviewed each of them separately. All three identified the appellant as the perpetrator.

Detective Benedict said that the suspect's car, a Crown Victoria, was a former police car that was white with silver tailpipes. After listening to the car, Davenport and Bennett

said it sounded the same as the one the appellant drove on the night of the shooting. Detective Benedict noted that the car had "after market tailpipes on it and it was very loud." He searched the vehicle and found two knives under the hood; one was a kitchen steak knife, and the other was an open folding knife.

Detective Benedict stated that the distance between Holt's house and Shelbyville was approximately twenty-eight miles. The place where Ray picked up the appellant was 1.8 miles from the location where Deputy Fann and Cash lost track of the appellant's scent.

On cross-examination, Detective Benedict said that the murder weapon was never found and that no ammunition was found in the Crown Victoria.

Detective Benedict said that an hour or so after the shooting, he put out a "be on the lookout" (BOLO) for the appellant. Shortly thereafter, he issued a press release and photograph to the local news networks regarding the search for the appellant. Detective Benedict stated that Davenport, Bennett, and Holt already knew that the appellant was the suspect, specifically noting that the witnesses told the police the appellant was the shooter. Detective Benedict did not caution the witnesses to not watch any news coverage about the murder.

Agent Terry Arney, an expert firearms and ballistic examiner with the TBI crime laboratory, testified that she examined the four fired bullets and four fired cartridge casings collected from the scene. She concluded that the bullets and casings were all fired from the same firearm.

On cross-examination, Agent Arney stated that no firearm was submitted to the laboratory for testing. She said that the bullets and casings were from a .25 caliber semiautomatic pistol. Agent Arney explained that a "stove pipe" malfunction occurred when an empty, fired cartridge casing remained lodged in the slide mechanism on top of a semiautomatic pistol instead of being successfully ejected from the pistol. She said that the gun could also jam when picking up a live cartridge. She explained that both malfunctions could potentially be fixed by manually pulling the slide back.

On redirect examination, she said that a stove pipe jam could also be cleared by knocking the trapped cartridge out of the gun.

On recross-examination, Agent Arney stated that after being fired, gunshot residue could get on the pistol and that the residue could be transferred by handling the gun.

Agent Bradley Everett, an expert serology DNA examiner with the TBI crime

laboratory, testified that he tested a black t-shirt. He did not detect any blood on the shirt. Agent Everett swabbed the collar of the shirt for DNA and found a mixture of DNA. The major contributor was consistent with the appellant's DNA, but there was insufficient DNA for a conclusive result regarding the minor contributor.

Agent Everett tested shoes collected from 901 West Grundy Street in Tullahoma. He found no blood on the shoes, and there was insufficient DNA for testing. He also tested a cellular telephone collected from Smyrna and found DNA consistent with the appellant's.

On cross-examination, Agent Everett said that the shoes he tested were dirty, size 13, black, high top, athletic shoes, and that the brand was Air Jordan.

Agent James Russell Davis, II, a gunshot residue expert with the TBI crime laboratory, testified that he examined the front side of a size XXXL dark t-shirt for gunshot residue. He found gunshot residue on both the right and left sides of the shirt. He acknowledged that it was possible for gunshot residue to be on someone who was not the shooter if the person stood next to the shooter when the gun discharged or if the person picked up a weapon that had been recently fired.

On cross-examination, Agent Davis said that he found no gunshot residue on the shoes. He said that he rarely found gunshot residue on shoes.

The State rested its case-in-chief.

Telisha Sparrow, the appellant's sister, testified for the defense. She said that the appellant was twenty-seven years old. She said that in August 2008, she was living in an apartment on Anthony Lane in Shelbyville with the appellant and his girlfriend, Tammy Williams. She stated that she had seen the appellant at the apartment the night before police came to her apartment to ask about the appellant. She said the appellant was not driving a car but that he was with Tommie Cannon, who was driving a car. The appellant and Cannon were in and out of the apartment that day. Ms. Sparrow stated that she went to bed between 11:00 p.m. and 12:00 a.m. Around 2:00 or 2:30 a.m., the appellant knocked on her window, and she let him in back door of the apartment. Thirty minutes to an hour later, the appellant called her and said that he was going to park Ms. Sparrow's car, a white Crown Victoria, at Davis Estates because he did not want to go to jail for driving without a license. Ms. Sparrow explained that Davis Estates "back[s] up to" the Anthony Lane apartments. She said that about twenty minutes later, she got up to go get the white car but was interrupted by the arrival of the police.

On cross-examination, Ms. Sparrow said that when the appellant called her around

2:30, 3:00, or 3:30 a.m., he said that "the police [were] after him and he was parking the car at Davis Estates because he didn't have a driver's license." She stated that the police never asked for the appellant; they only asked for the location of her car.

Ms. Sparrow said that the appellant called her later that morning. She told him that police were looking for him, saying he murdered someone. The appellant denied hurting anyone and did not reveal where he was. Ms. Sparrow did not tell police that she had not seen the appellant that night; she told police that she had not talked to the appellant.

Tommie Cannon testified that he lived in Shelbyville and had been friends with the appellant since they were five or six years old. Cannon said that he remembered seeing a report in the newspaper about the appellant being arrested. Cannon said that he and the appellant were together "the night before they said it was supposed to happen or something like that. . . . Might have been the same night." Cannon said that he and the appellant met at the appellant's apartment. After ten or fifteen minutes, they left together in Cannon's car, a black 1986 Cutlass. Cannon recalled that a white Crown Victoria was at the appellant's apartment; he thought the car belonged to the appellant's girlfriend. Cannon said that he and the appellant "rolled around" for a couple of hours and that they returned to the appellant's apartment complex around 1:00 a.m. They walked to the nearby apartment of Lakisa Adams where they watched television and talked for thirty or forty-five minutes. Thereafter, they returned to the appellant's apartment. Cannon stayed for about an hour then left around 2:30 a.m.

On cross-examination, Cannon said that when they returned to the appellant's apartment after visiting with Adams, they sat outside and talked. When Cannon left, he saw the appellant going in the front door of the apartment.

Lakisa Adams testified that around 12:00 or 1:00 a.m. the night before the appellant was arrested, the appellant and Cannon came to her apartment. They stayed for over an hour, watching television and talking.

Berry Odem testified that he lived in Spring Hill and that he knew the appellant, Davenport, Arias, and Leverette. Odem acknowledged that he had previously been convicted of three misdemeanor thefts and of misdemeanor criminal impersonation. Odem stated that he and Arias went to Holt's house around 4:00 p.m. looking for crack cocaine. Odem said that Arias seemed nervous. Odem left Holt's house at approximately 5:30 or 6:00 p.m. Odem stated that Davenport and Leverette had sold crack cocaine at Holt's house.

David Brundage, an expert in firearms, tool marks, gunshot residue, latent fingerprints, and tire mark identification, testified that fingerprints can be lifted from spent

cartridge casings. He stated that after a gun is fired, gunshot residue may be deposited on the hands of the shooter. Additionally, gunshot residue could be transferred to a weapon holster or fabric that comes into contact with the weapon after it is fired. He cautioned that latex gloves should be worn when evidence is collected to prevent gunshot residue from being transferred from an officer's hands to the item; otherwise, there is the possibility of cross-contamination.

On cross-examination, Brundage acknowledged that gunshot residue, particularly primer residue, is delicate and easily lost. Therefore, the lack of gunshot residue was not conclusive proof that someone did not fire a gun.

The jury convicted the appellant of two counts of the second degree murder of Arias, one count of the attempted first degree murder of Davenport, and one count of the attempted aggravated robbery of Davenport. The trial court merged the second degree murder convictions and sentenced the appellant to consecutive sentences of twenty years for the second degree murder conviction and the attempted first degree murder conviction. The trial court imposed a sentence of eight years for the attempted aggravated robbery conviction and ordered the sentence to be served concurrently with the twenty-year sentences for a total effective sentence of forty years.

On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred by failing to suppress the identification of the appellant as the perpetrator; (2) whether the evidence was sufficient to sustain his convictions; (3) whether the trial court erred by not upholding the appellant's Batson challenge; (4) whether the trial court erred by failing to strike Holt's written statement; (5) whether the trial court erred by admitting a photograph taken of Arias while he was alive; (6) whether the trial court erred by admitting the black t-shirt that purportedly belonged to the appellant; (7) whether the trial court erred in its communications with jurors; (8) whether the trial court erred in sentencing; and (9) whether the principles of double jeopardy were violated.

## II. Analysis

### A. Suppression of Identification

The appellant contends that the photograph lineup, which was viewed by Davenport, Bennett, and Holt on August 20, 2008, was unduly suggestive and violated his due process rights. Specifically, the appellant complains that a press release issued by the sheriff's department shortly after the shooting "unnecessarily tainted the identification procedure" and that the "identification was conducted in an impermissibly suggestive manner such that it created a substantial likelihood of irreparable misidentification." Therefore, the appellant

argues that the trial court should have suppressed the witnesses' identification of the appellant. In response, the State argues that none of the witnesses reported seeing the appellant's photograph in a news report prior to the identification and that, regardless, the photograph in the press release was not the photograph used in the lineup. Accordingly, the State contends that the identification process was not suggestive and that the trial court correctly denied the motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

At the suppression hearing, Detective Benedict testified that after the appellant was developed as a suspect, he prepared a press release for all local news outlets, which stated that the police were looking for the appellant in connection with a murder. Detective Benedict issued another press release after the appellant was apprehended. Both press releases included the appellant's driver's license photograph.

After the appellant was arrested, Detective Benedict compiled a photograph lineup using booking photographs. Detective Benedict noted that the appellant was wearing a yellow shirt in his booking photograph and was wearing a red shirt in his driver's license photograph. Holt, Davenport, and Bennett came to the police station, and Detective Benedict brought them into the interview room one at a time to view the photograph lineup. Detective Benedict did not tell any of the witnesses that the suspect was among those depicted. Detective Benedict did not ask the witnesses if they had seen anything on the television news about the case.

Lieutenant Tony Phillips testified that Holt, Davenport, and Bennett identified the appellant as the perpetrator. Lieutenant Phillips did not advise the witnesses to avoid newscasts relating to the case. Lieutenant Phillips said that he was present when the photograph lineup was shown to the witnesses. He did not ask the witnesses if they had seen

any news coverage about the case, the lighting in the house, or how long they viewed the assailant. He did ask them if they knew the appellant, but he could not recall their responses. Lieutenant Phillips said that the witnesses described the appellant as "a big, tall, heavy set black guy." They also described his hair and clothing, but Lieutenant Phillips could not remember the exact description.

Holt testified that while she was at work, she saw a news report that police were "looking for a – Mr. Sparrow from Shelbyville in regard to a murder in College Grove, Tennessee." Holt did not watch the entire report, explaining that "it was just something [she] didn't want to think about really." She briefly discussed with Davenport that police were looking for the appellant in Shelbyville. Holt said that she had previously seen the appellant two or three times. On the night of the shooting, she saw that the perpetrator was a big, black male, but the events happened too quickly for her to see the identity of the man. However, Davenport told her that the appellant was the perpetrator. Holt stated that she looked at the photograph lineup after seeing the news report, but she maintained, "I knew what I was looking for. I mean, I knew I had seen him before anyway, you know. . . . Because I didn't think the TV looked like him at all. . . . [H]e looked fatter."

Bennett testified that later on the morning of the shooting, while police were still at the scene, she saw a report on the television news regarding a murder, and during the report, a photograph of Holt's house was shown. Bennett said that she did not see another news report about the crime. Bennett said that she had previously seen the appellant at Holt's house. When she looked at the photograph lineup two or three days after the shooting, she identified the appellant as the perpetrator.

Davenport testified that he and Bennett saw the appellant during the shooting and that they knew he was the perpetrator. He stated that he, Bennett, and Holt discussed the appellant's being the perpetrator before they identified his photograph from the lineup.

The court found that any potential exposure to news reports identifying the appellant as the perpetrator did not "ipso facto invalidate[] the photo array that was used in this instance." Therefore, the court found that the appellant's constitutional rights were not infringed and denied the appellant's motion to suppress the identification. On appeal, the appellant challenges this ruling.

In Neil v. Biggers, 409 U.S. 188, 198-99 (1972), the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. Biggers, 409 U.S. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood

of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Biggers, 409 U.S. at 198-99.

The proof at the suppression hearing and at trial revealed that only Davenport and Bennett clearly saw the shooter that evening. They stated that they knew him as Larry and had seen him at Holt's house previously. Although Holt did not clearly see the shooter, Davenport and Bennett told her that the appellant was the perpetrator. Davenport said that he never saw any news coverage about the shooting. Bennett said that she saw a television news report and that the only photograph in the report was of the house. Holt said that she saw the appellant's photograph in a television news report but that she did not think the photograph closely resembled him. Therefore, there was no indication that the primary identification witnesses, Davenport and Bennett, were influenced by any potential news coverage containing the appellant's photograph.

Moreover, as the trial court found, even if the witnesses had seen the photograph, it did not necessarily taint the identification. Generally, a pretrial identification procedure, even if suggestive, will not negate the identification of the appellant when it is otherwise reliable. Biggers, 409 U.S. at 198-99; Cribbs, 967 S.W.2d at 794. In Biggers, 409 U.S. at 199-200, the Supreme Court identified five factors for assessing the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. See also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). If, using the Biggers standard, a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and in-court identifications are excluded. State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

Davenport and Bennett both testified that they clearly saw the appellant, whom they knew as Larry, on the night of the shooting. Two days after the shooting, they positively identified the appellant as the perpetrator from a photograph lineup. The photograph was not the same as the photograph in the press release. Regardless, Davenport and Bennett knew the appellant as a prior acquaintance. Accordingly, we conclude that the trial court did not err in denying the appellant's motion to suppress the identification of the appellant as the perpetrator. See State v. Cedric Terry, No. W1999-01568-CCA-R3-CD, 2001 WL 204185, at *4 (Tenn. Crim. App. at Jackson, Feb. 23, 2001); see also State v. Marcus Fitzgerald, No. W2000-02669-CCA-R3-CD, 2002 WL 1558500, at *8 (Tenn. Crim. App. at Jackson, Jan.

15, 2002).

## B. Sufficiency of the Evidence

Next, the appellant challenges the sufficiency of the evidence sustaining his convictions of the second degree murder of Arias, the attempted first degree murder of Davenport, and the aggravated robbery of Davenport. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Second degree murder is defined as the knowing killing of a victim. See Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b); see also State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon the following factors to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See State v. Pike, 978

S.W.2d 904, 914 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

The proof at trial revealed that the appellant tried to sell Davenport a gun and a CD player before shooting Arias. Davenport and Bennett testified that after the shooting, the appellant burst into Davenport's bedroom, went to Davenport's side of the bed, and demanded, "[G]ive me everything you've got, Bubba." Davenport responded that he did not have anything, the appellant pointed the gun at Davenport, and the gun "click[ed]." Davenport saw that the gun was jammed, and he feared that the appellant would kill everyone in the house. When speaking to police, Davenport, Bennett, and Holt positively identified the appellant as the perpetrator. During a search, police found a recently discarded black t-shirt with the appellant's DNA on the collar and gunshot residue on the front.

The appellant asserts that Davenport, Bennett, and Holt were not reliable witnesses

because they were admitted crack cocaine users. At trial, Holt testified that she did not use cocaine prior to the shooting, and Davenport and Bennett testified that the crack cocaine they had used was no longer affecting them at the time of the shooting. The appellant complains that the officers who handled the black t-shirt could have contaminated it with gunshot residue from their hands. However, the officers who handled the t-shirt testified that they had not fired their weapons near the time the shirt was discovered and that any chance of contamination was minimal. The appellant contends that the lack of blood on the t-shirt or his shoes suggests that the appellant was not the shooter. Neverthlesss, the jury chose to believe the testimony of Davenport and Bennett that the appellant was the shooter. The jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that a reasonable jury could have found the appellant guilty of the second degree murder of Arias and of the attempted first degree murder and attempted aggravated robbery of Davenport.

### C. Batson Challenge

The appellant argues that the trial court erred by allowing the State to dismiss Juror Garrett, a black female. The appellant contends that the dismissal was not based upon a sufficiently gender-neutral or race-neutral reason.

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated his right to equal protection under the Fourteenth Amendment to the United States Constitution. In Powers v. Ohio, 499 U.S. 400 (1991), the Court eliminated the requirement that the defendant and any wrongfully excluded juror(s) be of the same race. See State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992). Thus, under Powers, a defendant can establish a prima facie case of purposeful discrimination by showing that the prosecution excluded members of a cognizable racial group from the venire. Id. To invoke Batson protections, a defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender. See Batson, 476 U.S. at 94. Once the defendant has presented a prima facie case of purposeful discrimination, the trial court shall require the State to give a race-neutral reason for the challenge. Id.

During voir dire, the State used a peremptory challenge to excuse Juror Garrett. The appellant raised a Batson challenge, arguing that the appellant was black and so was Juror Garrett. The court asked the State for the reason for dismissing Juror Garrett. The State

responded:

> It's more with her responses to when people are talking. But there were three different things: One was when I was talking to Mr. Wicks about the higher standards she was always nodding to his responses like she was agreeing to his responses about holding me to a higher standard than reasonable doubt because of the seriousness of this case.[1]
>
> The second reason was that when they were getting into who watches CSI and stuff like that, she watches CSI. And there is going to be a lot of TBI things. She was one of the ones that watches CSI. Which as you know in my experience, particularly with jury trials, that standard is way above any actual reality having to do with TBI or anything that they do, that show. I mean, they do investigations, they can find fingerprints on things that nobody else in the world can find.
>
> There was a third thing and I didn't write it down, but it was something that [defense counsel] was saying that she was agreeing with, nodding her head. Had to do with one of the bias of – it was when she rolls her eye when he was talking about his client not having to testify, and it was something in that area. I didn't write that one down though.
>
> But, I mean, it was – after a while I was getting a horrible feeling about her that she was going to hold me to a higher standard and just bringing stuff up of scientific testimony that I just don't think – that's one lady right next to her, that was the other CSI one. And I just think that that brings in a standard way more than I have to prove.

The State further noted that the race composition of the jury pool did not change because other African-American women remained in the jury pool.

Our supreme court has emphasized that under <u>Batson</u>, a trial court "'must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has

---

[1]Only the portion of voir dire concerning the dismissal of Juror Garrett was transcribed for the record on appeal. The transcript does not include the questions asked to or the responses of Juror Wicks.

-23-

been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination.'" State v. Hugueley, 185 S.W.3d 356, 369 (Tenn. 2006) (quoting Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996)). In the present case, the trial court did not expressly find that the appellant had made out a prima facie case of racial discrimination, yet it required the State to provide a reason for striking Juror Garrett. Therefore, we will proceed on the assumption that the trial court found that a prima facie case was established. See, e.g., Hugueley, 185 S.W.3d at 371; Woodson, 916 S.W.2d at 905.

The State explained that it struck Juror Garrett based upon her body language, her nodding in agreement with the responses of others about holding the State to a standard higher than beyond a reasonable doubt, and her "avid" watching of the television show CSI. Our supreme court has stated, "If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination." Hugueley, 185 S.W.3d at 368 (citing Batson, 476 U.S. at 98). The "trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." Id. (citing Miller-El v. Dretke, 545 U.S. 231 (2005)). In this case, the court stated that it did not see Juror Garret nodding but noted that it did not doubt the State's observations. Accordingly, the court found that the State articulated a specific, non-race related reason for excusing Juror Garrett. Further, the court said that Juror Garrett, an African-American woman, was replaced by Juror Johns, who was also an African-American woman. Therefore, the court overruled the appellant's Batson challenge. We conclude that the totality of the circumstances do not support a finding of purposeful discrimination and that the trial court properly overruled the appellant's Batson challenge.

D. Holt's Statment

The appellant complains regarding the admission of Holt's prior statement to police, asserting that it was "self-serving hearsay." In response, the State argues that Holt's statement was not hearsay because it was used only to refresh her recollection and was never admitted into evidence.

At trial, Holt said that she did not recall seeing a gun on the night of the shooting and that she could not recall the race of the perpetrator. The State attempted to show Holt a written statement she gave police. The appellant objected, contending that the statement was "self-serving hearsay." The State clarified that it wanted to use the statement to refresh Holt's recollection. The court allowed the State to use the statement for that purpose. At that point, the State asked Holt if she could recall what she said in her statement about seeing a gun or the race of the perpetrator. She said that she could not. The State asked if seeing the

statement would help refresh her recollection. She said that it might because the events were "more vivid" at the time she gave the statement. The State passed Holt the statement, and the court admonished her to read the statement to herself. Nevertheless, Holt read aloud, "I was sleeping and heard what I . . . ." The court stopped her, again cautioning her to read the statement to herself. Holt then read aloud, "I jumped up and there was a tall black guy with a gun . . . ."

The appellant objected, complaining that Holt had read part of the statement aloud. The court overruled the objection. The State then asked Holt if the statement refreshed her recollection, and Holt stated that it did. The State asked for the statement to be introduced for identification purposes only. The court stated, "I don't do the identification thing. I'm going to allow it to be made Exhibit Number 18. And what will happen is it will not be allowed to be shown to the jury. It will be for other purposes only." Thereafter, Holt testified that after reading her statement, she recalled that the perpetrator was black but that she still did not recall whether he had a gun.

Generally, hearsay, which is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is not admissible unless it falls under an exception to the rule against hearsay. Tenn. R. Evid. 801(c), Tenn. R. Evid. 802. However, in the instant case, the statement itself was not "offered in evidence." Instead, the State used the statement to attempt to refresh Holt's recollection. See Tenn. R. Evid. 612 (stating that while testifying, a witness may use a writing to refresh his or her memory for the purpose of testifying). The use of a statement to refresh recollection under Tennessee Rule of Evidence 612 does not violate the rule against hearsay. See State v. Mark Walker, No. M2001-00341-CCA-R3-CD, 2002 WL 1558515, at *11 (Tenn. Crim. App. at Nashville, July 16, 2002). Further, Tennessee Rule of Evidence 803(5) provides that the following items are not excluded by the rule against hearsay:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

In order to justify the use of a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must demonstrate that it is necessary to refresh the

witness's memory and that the writing will provide the necessary refreshing. See State v. Mathis, 969 S.W.2d 418, 421 (Tenn. Crim. App. 1997). After looking at the statement, Holt was able to independently testify of her own recollection about the race of the perpetrator but not about whether he had a gun. See State v. Carpenter, 773 S.W.2d 1, 10 (Tenn. Crim. App. 1989). Therefore, the trial court did not err in allowing the State to use the statement to refresh Holt's recollection.

We note that although Holt was cautioned to read the statement to herself, she read a brief portion of the statement aloud. The appellant argues that the jury could have placed "more emphasis on her recorded, uncross-examined hearsay recollection than her testimony at trial." However, after reading the statement, Holt confirmed that she recalled the perpetrator was black but could not recall him holding a gun. We conclude that any error committed by reading the brief portion of the statement aloud was harmless. See Tenn. R. App. P. 36(b); State v. Dotson, 254 S.W.3d 378, 388 (Tenn. 2008).

### E. Life Photograph

On appeal, the appellant appears to argue that the photograph of the victim while alive was irrelevant to any issue at trial, specifically contending that he "does not dispute the cause of the victim's death." He also appears to complain that if the photograph were relevant, it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. The State contends that even if the photograph were irrelevant, the admission of the photograph was harmless.[2]

During Davenport's direct examination, the State attempted to introduce a photograph of Arias while he was alive. The appellant objected, arguing that the photograph was not relevant. The State responded that the photograph identified Arias. The court overruled the objection, stating that the photograph could be admitted to identify the victim. The appellant then raised a second objection, contending that he had not previously been made aware that the State would attempt to admit a photograph taken while the victim was alive. The appellant said that case law supported his objection. The parties and the court agreed to resume the discussion the next morning to give defense counsel an opportunity to research the issue.

---

[2]The State maintains that on appeal, the appellant argues a different theory of exclusion than that forwarded at trial. At trial, the appellant complained that the photograph was not relevant. On appeal, the appellant extensively quotes from State v. Prince Adams, No. W2009-01492-CCA-R3-CD, 2011 WL 4375332, at *6 (Tenn. Crim. App. at Jackson, Sept. 21, 2011), perm. to appeal granted, (Tenn. Feb. 15, 2012). He makes little further argument other than the quotation from Adams. However, Adams concerned the relevance of a photograph of a murder victim while alive; therefore, we have generously construed his quotation as a furtherance of his complaint regarding relevancy.

The following day, Holt testified that she had known Arias for approximately two years. Holt identified the photograph of Arias while he was alive. The State asked for the photograph to be made an exhibit. The court said, "As per the issues noted previously and reserved, the Court accepts this as the next . . . exhibit."

The decision regarding the admissibility of photographs lies within the sound discretion of the trial court, and that ruling will not be overturned on appeal absent a showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "'If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; . . . the photograph would be cumulative; . . . or [the photograph] is gruesome or for some other reason is likely to inflame the jury.'" Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973) (quoting 3 Wharton's Criminal Evidence § 637 (13th ed.)).

We note that our supreme court has previously approved of the admission during trial of a photograph taken while the victim was alive to establish the corpus delecti of the crime and to prove that the "person killed was the same person named in the indictment." State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998) (appendix). However, the relevancy of such photographs can be tenuous, or the evidence can be cumulative to other photographs of the victim taken at the crime scene or during autopsy. See State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006); State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981). In the instant case, there was no issue about the victim's identity or about his being alive prior to the crime. As such, there was little, if any, relevance to the photograph. Therefore, we conclude that the trial court erred by admitting the photograph. Regardless, we note that the error was harmless. See, e.g., Young, 196 S.W.3d at 106-07. Therefore, the appellant is not entitled to any relief on this issue.

### F. Admissibility of the Black T-Shirt

The appellant challenges the admissibility of the black t-shirt, asserting that the State failed to sufficiently establish the chain of custody for the shirt and that there was insufficient proof as to the shirt's relevance. However, as the State contends, the appellant failed to contemporaneously object to the admission of the t-shirt. In fact, before the t-shirt was admitted into evidence, the trial court specifically asked defense counsel if there was an

objection. Defense counsel responded, "No." Accordingly, the appellant has waived this issue. Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

## G. Court Communication with Jurors

On appeal, the appellant complains about two communications between the trial court and the jury. First, the appellant challenges the trial court's responding to a jury question that was submitted during deliberations by giving the answer to the jury foreman and directing the foreman to take the answer to the rest of the jurors. Second, he challenges the trial court greeting the jury in the morning outside the presence of the parties.

### 1. Supplemental Instruction

During deliberations, the jury sent the trial court the following question: "should the lesser included second-degree murder be read as second-degree felony murder?" The trial court said that it would inform the jury that the original charge was correct and would not give further instruction. The court said that it would not bring the jury into the courtroom to answer the question. Defense counsel said that he thought the jury should be brought into the courtroom because it would be inappropriate for the judge to speak with the jury in the deliberation room without the parties being present. The court responded that it would have the jury foreperson come into the courtroom and have him relay the answer to the rest of the jury.

The appellant does not contend that the trial court's answer to the jury question was incorrect. However, he complains about the trial court's method of answering the question. The appellant contends that the entire jury should have been brought into the courtroom for the question to be answered. The State contends that the appellant has waived this issue by failing to contemporaneously object. See Tenn. R. App. P. 36(a). Our review of the record reveals that although the appellant expressed displeasure at the idea of the trial court going into the jury room to answer the question, he raised no objection when the trial court brought the jury foreman into the courtroom to receive the answer to the question.

We note that a trial judge has the authority to give supplemental instructions in response to jury questions. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). This court has previously stated that when giving a supplemental instruction,

> the appropriate course of action for the trial court would have
> been to bring the jurors back into open court, read the

-28-

supplemental instruction . . . along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions, and then allow the jury to resume its deliberations.

State v. Bowers, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001); see also Spencer v. A-1 Crane Serv., 880 S.W.2d 938, 941 (Tenn. 1994); State v. Mays, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984). Regardless, we conclude that nothing in the record indicates that the trial court's error in its method of delivering an answer to the jury's question more probably than not affected the judgment in light of the entire record. See Bowers, 77 S.W.3d at 791; Tenn. R. App. P. 36(b).

### 2. Ex Parte Communication

Next, the appellant challenges the trial court's speaking with the jury out of the presence of counsel and the appellant. However, the appellant acknowledges that he "does not have any way to determine what was communicated to the jury."

The facts regarding this issue are gleaned solely from the transcript of the hearing on the motion for new trial. During the hearing, defense counsel said that "there was some indication that the Court had talked to the jury out of the presence in – I think that what the Court was doing was talking, saying hello, . . . goodbye, . . . that sort of thing, but we allege that any communication outside the presence of the jury is potential error." In response, the trial court stated:

> I'm sure I did speak to the jury. Whenever juries come back on the next morning of a prolonged trial I take the opportunity to go back to the jury room, welcome them back, . . . make sure that they're all here, not that I don't trust our law clerks to appropriately count, but I make sure that they're all here. Make sure that there are no concerns, family emergencies or otherwise. The Court considers that jury an administrative function of the Court and does not believe it to be inappropriate.

The record does not specifically reflect what, if anything, the trial court said to the jury. Even the appellant alleges that, at most, the court exchanged pleasantries with the jury.

Nevertheless, this court has previously stated that "[g]iven the importance of judicial impartiality and fairness in appearance as well as in fact, it is generally considered improper for the trial judge to communicate with jurors off the record and outside the presence of

counsel." State v. Tune, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993). Therefore, "[w]hen such ex parte communications relate to an aspect of the trial, the trial judge should usually disclose the communication to counsel for all parties." Id. Regardless, such instances are subject to harmless error analysis. Id.

Generally, ex parte communications by the trial court and the jury are subject to reversal "'where a timely complaining party shows specific prejudice, or where, owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless.'" Id. (citing Guy v. Vieth, 754 S.W.2d 601, 605 (Tenn. 1988)). To this end, our supreme court has stated:

> "We recognize that there may be times when administrative communications between judge and jury may properly transpire in the absence of counsel, so long as these communications do not contain supplemental instructions relating to the case and are clearly incapable of prejudicing the rights of the parties. In this general category would be communications relating to the jurors' welfare, comforts and physical needs. Such communications must not directly or indirectly refer to the specifics of the case, must be collateral to the issues under consideration, and must not be capable of affecting the deliberative process in any manner."

Guy, 754 S.W.2d at 605 (quoting Truscott v. Chaplin, 403 F.2d 644, 645 (3d Cir. 1968)). From our review of the record, we can discern no prejudice to the appellant by the trial court's greeting the jury. Therefore, we conclude that the appellant is not entitled to relief on this issue.

## H. Sentencing

The appellant raises several issues regarding sentencing. Specifically, he complains that the State gave insufficient notice of enhancement; therefore, the court erred by finding that he was a multiple Range II offender in regard to his attempted aggravated robbery conviction. He also contends that the length of his sentences is excessive and that the trial court erred by the imposing consecutive sentencing.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion

-30-

standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

### 1. Notice

The appellant argues that the trial court erred by finding that the appellant was a multiple, Range II offender for his attempted aggravated robbery conviction because the State's notice was deficient. Prior to trial, the State filed a "Notice of Intent to Use Criminal History and Evidence of Prior Bad Acts." Therein, the State maintained that it was listing the appellant's criminal history to provide notice for "enhancement of punishment, impeachment, cross-examination, evidence of prior bad acts and any and all other purposes allowed under current law." The notice consisted of approximately seven pages of the appellant's prior criminal history. The notice provided the name of the offense of which the appellant was convicted, the court in which the appellant was convicted, and the date on which the appellant was convicted. However, the notice did not specify the range of punishment sought or which convictions were the felonies to be used to support the range enhancement.

On October 12, 2011, the appellant filed a "Motion to Strike Sentencing Enhancement of the Defendant Sparrow," arguing that the notice was insufficient. Specifically, the appellant complained that the "'mult-tasking' Notice of Intent to Use Criminal History and Evidence of Prior Bad Acts[] does not advise the [appellant] of what status the State asserts for the [appellant] at Sentencing." On November 29, 2011, the trial court denied the appellant's motion, stating that after a hearing had been held on the matter, the court found the notice to be sufficient. The court further stated that "the State was ordered to give a copy of the [appellant's] certified priors and Pen. Pack to the [appellant]." The "Pen. Pack" is

included as an exhibit to the sentencing hearing, which was held on January 4, 2012. The packet contains copies of the appellant's judgments of conviction.

Tennessee Code Annotated section 40-35-202(a) provides:

> If the district attorney general believes that a defendant should be sentenced as a multiple . . . offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea. The statement . . . must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions.

See also Tenn. R. Crim. P. 12.3(a) ("Written statements of the district attorney giving notice that the defendant should be sentenced to an enhanced punishment . . . shall be filed not less than ten (10) days prior to trial. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial.").

"The purpose of the statutory notice of intent to seek enhanced sentencing is to (a) provide fair notice to an accused that he/she is exposed to other than standard sentencing, (b) to facilitate plea bargaining, (c) to enable the accused to make an informed decision before entering a guilty plea, and (d) to a certain extent, to aid in trial strategy." State v. Livingston, 197 S.W.3d 710, 713-14 (Tenn. 2006). Generally, "when the State has substantially complied with [Tennessee Code Annotated section] 40-35-202(a), an accused has a duty to inquire about an ambiguous or incomplete notice and must show prejudice to obtain relief." State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990).

We conclude that the State substantially complied with Tennessee Code Annotated section 40-35-202(a) because the notice "contains the State's express intent 'to seek enhanced punishment,' sets forth the nature of the prior felony convictions, the dates, and the identity of the courts of the convictions, and was filed months in advance of the trial and sentencing hearing." State v. Taylor, 63 S.W.3d 400, 413 (Tenn. Crim. App. 2001). Moreover, after a hearing on the issue, the appellant was supplied with the "Pen. Pack," giving him actual notice of the offenses that would be used to enhance his sentence. As our supreme court has explained:

> While "perfect" notice is not required, . . . we have strictly applied the requirement of section 40-35-202(a) that

-32-

> some notice meeting the minimal requirements of the statute be
> given. . . .
>
> To reiterate, the notice provision of Tenn. Code Ann. §
> 40-35-202(a) requires, at a minimum, that the State file: (1)
> written notice, (2) clearly expressing the State's intention to seek
> sentencing outside of the standard offender range, (3) setting
> forth the nature of the prior felony conviction, the dates of the
> convictions, and the identity of the courts of the convictions.

Livingston, 197 S.W.3d at 713-14 (footnote omitted).

The record establishes the notice reflected, in pertinent part, that the appellant had prior convictions of forgery up to $1,000, a Class E felony and of selling less than .5 grams of cocaine, a Class C felony. Thus, he had notice of the offenses being used to enhance his sentence. After applying the convictions to his instant conviction of attempted aggravated robbery, a Class C felony, the appellant was properly classified as a Range II offender. See Tenn. Code Ann. § 40-35-106(a)(1). Therefore, we conclude that the appellant is not entitled to relief on this issue.

### 2. Length of Sentence

The appellant argues that the length of his sentences is excessive. He specifically contends that the trial court erred in failing to apply mitigating factors and in weighing the enhancement factors and mitigating factors.

At the sentencing hearing, Arias's oldest brother, Renee Arias, testified that the victim was forty-four years old at the time of his death. He said that he and the victim were from Cuba and that they were close. He said that the victim was hardworking, gentle, funny, happy, and a good father. He stated that his family blamed him for the victim's death.

Bennett testified that the victim was a friendly, wonderful person. She stated that she thought the appellant intended to kill everyone in the house, saying "I really and truly believe with all my heart if there had been any more bullets in that gun we would have all been killed." She said that she had trouble sleeping and that she suffered from anxiety about being in the house alone. She maintained that she had been though counseling after the incident. She stated that she had been a crack cocaine addict but that she had not used drugs since the shooting.

Ralph H. Buddy Peden, who was a retired food business sales executive, testified that

he was a recovering alcoholic and that he went to the Williamson County Jail every Thursday for an Alcoholics Anonymous meeting with the inmates. He stated that for two years, the appellant had been actively participating in the meetings. He said that the appellant was an outspoken leader and talked about "the error of his ways." Peden believed that the appellant had made a major change in his life.

Charles Edward Gospodarek, a retired systems administrator for Hartford Insurance, testified that he was active in sponsoring people in drug recovery, including at the Williamson County Jail and the Easley Criminal Justice Center. He stated that for two or three years, the appellant had participated in the Alcoholics Anonymous meetings. Gospodarek stated that at first, the appellant was quiet. Then, he began talking about his issues. Gospodarek said that the appellant had benefitted from his participation in the meetings and that other inmates had benefitted from the appellant, as well.

Correctional Officer Lance John Dorman testified that he worked the area in which the appellant was housed and that he had few problems with the area. He stated that the appellant was not a disruptive inmate.

Correctional Officer James Hamner Gillam testified that he worked the area in which the appellant was housed and that the appellant was a respectful, nondisruptive inmate.

In the presentence report, the appellant described his family history as having its "ups and downs." He explained that his mother was addicted to drugs and frequently changed addresses. He said that he and his sisters "were passed from house to house among relatives." He acknowledged that he was "a 'problem child.'" He stated that while his sisters continued to live with relatives, he was placed in foster care.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant was convicted of second degree murder, a Class A felony; attempted first degree murder, a Class A felony; and attempted aggravated robbery, a Class C felony. As a standard, Range I offender, he was subject to a sentence between fifteen to twenty years for each Class A felony conviction. Tenn. Code Ann. § 40-35-112(a)(1). As a multiple, Range II offender, he was subject to a sentence between six and ten years for the Class C felony conviction. Tenn. Code Ann. § 40-35-112(b)(3). The trial court sentenced the appellant to twenty years for each of his Class A felony convictions and to eight years for his attempted aggravated robbery conviction.

The trial court found the following enhancement factors: (1) that the appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (7) that the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement; (9) that the appellant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; (10) that the appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (7), (9), and (10).

With regard to enhancement factor (1), the trial court noted that the appellant had a history of multiple criminal convictions. Tenn. Code Ann. § 40-35-114(1). The appellant, who was twenty-seven years old, had approximately fifty-five prior convictions. Therefore, this enhancement factor was applicable.

With regard to enhancement factor (7), the trial court said that "there could be an argument made that the [appellant] obviously came in for the purposes of obtaining drugs for – and that would be to gratify a desire for pleasure, but I don't put much weight on that. I

don't think it's necessarily appropriately applied, but it certainly is a factor that the Court could consider." Tenn. Code Ann. § 40-35-114(7). We can find nothing in the record to support the application of this enhancement factor.

With regard to enhancement factor (9), the court applied it to the second degree murder and attempted murder convictions. Tenn. Code Ann. § 40-35-114(9). However, the court stated that it would not afford the enhancement factor much weight. Because the use of a weapon is not an element of second degree murder or attempted first degree murder, the trial court was entitled to use this enhancement factor to enhance the sentence for those convictions.

With regard to enhancement factor (10), the court found that the appellant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10). However, the court stated, "I think that is anticipated by the statutes and is not necessarily applied as an enhancement factor." Because enhancement factor (10) is inherent in the offenses for which the appellant was convicted, the trial court was correct in stating that enhancement factor (10) should not be applied. See State v. Robert Jesus Porrata, No. W2011-00749-CCA-R3-CD, 2012 WL 5199693, at *6 (Tenn. Crim. App. at Jackson, Oct. 22, 2012).

The court found that mitigating factor (6), that the appellant, because of youth or old age, lacked substantial judgment in committing the offense, did not apply. The trial court stated that the appellant was twenty-four years old at the time of the offense, "I don't believe there's any evidence that his maturity level was so low that that mitigating factor should be applied here."

The trial court also found under enhancement factor (13), that the appellant's "background does not have any offenses where violence was used to precipitate any type of criminal activity." Additionally, the court found that the appellant had family support and that he was well behaved in jail.

The appellant does not complain about the application of any of the enhancement or mitigating factors. His only complaint is about the weight attributed to the factors. Specifically, the appellant argues that the trial court should have attributed more weight to the mitigating factors, particularly his difficult childhood and his good behavior in jail. However, this court does not reweigh mitigating and enhancement factors. See Carter, 254 S.W.3d at 345. Therefore, this issue is without merit.

### 3. Consecutive Sentencing

The appellant argues that the trial court erred by ordering that the sentences be served consecutively. Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the criteria. In the instant case, the trial court found criterion (2), that the appellant was an offender whose record of criminal activity was extensive. Tenn. Code Ann. § 40-35-115(b)(2). The court noted that, even at the appellant's relatively young age, he had an extensive criminal history and had committed an offense "pretty much every year since the age of majority." The appellant's presentence report reflects that as an adult, the appellant had been convicted of: two counts of felony forgery up to $1,000; two counts of felony possession of less than .5 grams of cocaine; thirty-nine counts of misdemeanor theft; misdemeanor failure to appear; misdemeanor conspiracy to distribute drugs; driving while his license was suspended; driving on a revoked license; possession of a weapon with the intent to go armed; and traffic offenses. Additionally, the presentence report reflects that the appellant has violated probation or parole on four occasions. Therefore, the record supports the conclusion that the appellant has an extensive criminal history.

The trial court also found that the appellant's behavior reflected that he "had no hesitation in committing a crime in which the risk to human life was high." Without specifically stating so, the court essentially found that the appellant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(4). Generally, in order to find that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The court stated that the instant crimes were "egregious." Specifically, the court stated that the appellant went into someone's home as an invited guest; shot Arias multiple times without provocation, including shooting Arias in the back; then the appellant committed further criminal acts by attempting to rob and shoot Davenport. The court found that, "obviously, [the appellant] has no regard or at least had no regard on this evening of the sanctity of human life and, quite frankly, I don't find that he has much regard for it now." The court said, "Certainly, this Court could look at his record and say that the –that the community would not be safer having him on the streets as the community would having him locked up based upon the number of criminal offenses he's had in his fairly young life." We conclude that the trial court did not err by imposing consecutive sentencing based upon the appellant

being a dangerous offender.

## I. Double Jeopardy

Finally, the appellant raises multiple double jeopardy arguments. The double jeopardy clauses of the United States and Tennessee constitutions protect an accused from: (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 548 (Tenn. 2012). Recently, in Watkins, our supreme court opted to rely upon a two-step test based upon Blockburger to determine when double jeopardy attached. Id. at 556-57. Our supreme court stated that courts must "first consider whether the defendant's dual convictions arose from the same act or transaction." Id. at 558. The second step of the test "requires courts to examine the statutory elements of the offenses." Id. at 557. Generally,

> [i]f the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

Id. (footnote omitted).

First, the appellant argues that he should not have been sentenced for both second degree murder convictions. However, the record reflects that the second degree murder convictions were merged; therefore, the principles against double jeopardy were not violated.

Next, he contends that his

> attempted aggravated robbery conviction stems from his act of attempting [to take] the victims or occupants' property. And the attempted murder conviction arose from the [appellant's] attempt to put the victims and occupants of the attempted robbery in fear. The aggravated robbery statute obviously exists to prohibit a person from forcibly taking property from another by using a deadly weapon or causing serious bodily injury. The threat of murder is very persuasive in convincing others to give up their property. In our case, thus, the evidence relied on by

-38-

the State is the same for all the convictions, a continuous criminal episode.

The appellant's second degree murder conviction stemmed from the shooting of Arias. His attempted first degree murder conviction stemmed from his unsuccessful attempt to shoot Davenport. His attempted aggravated robbery conviction stemmed from his pointing a gun at Davenport and demanding "everything you've got." None of the offenses are statutorily the "same offense" for double jeopardy purposes. Accordingly, this issue is without merit.

### III.  Conclusion

In sum, we conclude that the trial court did not err by failing to suppress the identification of the appellant as the perpetrator; that the evidence was sufficient to sustain his convictions; that the trial court did not err by not upholding the appellant's Batson challenge; that the trial court did not err by failing to strike Holt's statement; that the trial court did not err by admitting a black t-shirt; and that the trial court did not abuse its discretion in sentencing the appellant. Additionally, we conclude that the appellant was not prejudiced by any errors the trial court made in admitting a photograph of Arias that was taken while he was alive or during its communications with jurors. Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE